UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LORI ROBINSON,

    Plaintiff,

    v.

ERGO SOLUTIONS, LLC,

    Defendant.

Civil Action No. 12-147 (JDB)

## MEMORANDUM OPINION

Plaintiff Lori Robinson ("Robinson") brings this action against her former employer, Ergo Solutions, LLC ("Ergo"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-2(a)(1). Specifically, Robinson alleges that she was sexually harassed and subjected to a hostile work environment because of her gender. The Clerk has entered a default against Ergo, due to its failure to respond to the complaint. Ergo has filed [8] a motion for default judgment. For the reasons set forth below, the Court will grant the motion, issue a default judgment in favor of Robinson and against Ergo, and award damages in the amount of $20,000.

## BACKGROUND

**A. Factual Background**

Ergo "is a private health services company" with offices located in the District of Columbia. Compl. [ECF No. 1] ¶ 5. Robinson, a female citizen of Maryland, alleges that she was "employed at Ergo Solutions . . . at all times relevant to this lawsuit." Id. ¶ 4. She was "initially employed in the position of Outpatient Project Manager," id. ¶ 6, a position with duties

that "included management of the day to day operations of Ergo Solutions staff," and "billing." Id. ¶ 7. In that role, Robinson "reported to each of the owners: Olu Ezeani, Courtland Wyatt, Jason Henderson and George Brownlee." Id.

In 2009, Robinson alleges that one of her direct supervisors (and Ergo's Chief Information Officer and partial owner), Jason Henderson, began treating her inappropriately. He made vulgar sexual remarks at work, like "I see that you haven't lost that ass." Id. ¶ 8. Robinson was "shocked" by such comments. Id. Henderson "would stare at Ms. Robinson and tell her that he always wanted her around." Id. In one notable incident, Robinson "was talking to an owner, Mr. George Brownlee about a work issue when Mr. Henderson came to where they were and inserted himself into the conversation." Id. ¶ 9. When Brownlee left, Henderson "started rubbing Ms. Robinson's legs." Id. Robinson "did not like him rubbing her legs but she felt that she had no one to complain to because he was an owner." Id. Henderson allegedly "told her that he was not going to tell anyone and that he did not want his partners to know that he was feeling up an employee." Id. Although "Robinson was upset by this encounter," she "did not file a complaint against Mr. Henderson." Id.

Soon after, Henderson's "personal advances" toward Robinson "became more intense." Id. ¶ 11. Robinson "did not know why Mr. Henderson was showering her with attention." Id. Henderson "began to call her on the weekend," and "one weekend he called her and told her that he had a dream about her and him." Id. The dream Henderson described to Robinson over the phone "was sexual." Id.

Later, Henderson asked Robinson "to come to a meeting at a hotel," where "he made advances toward Ms. Robinson and urged her to go to a room with him." Id. ¶ 12. The two of them then had sex. Id. Allegedly, "Robinson did not want to have sex with Mr. Henderson but

2

because he was an owner she felt that she could not turn him down and maintain her position at Ergo Solutions." Id.

Robinson continued to work at Ergo, and Henderson continued to make "sexual advances toward her." Id. ¶ 15. Henderson also made vulgar remarks about others in Robinson's presence, like "that woman sure does have a big ass," in reference to someone nearby. Id. Robinson "found his comments to be humiliating and improper," and they "caused her to lose respect for Mr. Henderson." Id. During the Christmas holidays in 2009, "Henderson called Ms. Robinson on her cell phone while she was at home and indicated that he wanted to have a meeting with her." Id. ¶ 19. Robinson "asked him what the meeting was for," and Henderson responded "that he wanted to have sex with her." Id. Robinson "was disgusted," and "informed Mr. Henderson that she was out of town and unavailable to meet with him." Id.

In March 2010, "Henderson and the other owners obtained an office at the hospital upstairs above the offices" in which Robinson worked. Id. ¶ 16. Henderson "called Ms. Robinson several times and tried to convince her to come upstairs to have sex with him." Id. Robinson "refused to go to the upstairs office or to have sex with Mr. Henderson in the office." Id. Then, Henderson "sent Ms. Robinson a text message offering to 'lick' her. She felt so uncomfortable that she did not respond to the text messages." Id.

Henderson "began to refer to Ms. Robinson as his 'Work Wife.'" Id. ¶ 17. Robinson "found this reference to be disgusting and asked Mr. Henderson to stop." Id. Henderson "did not desist from referring to her this way and wrote this reference on several documents so that Ergo coworkers could see it." Id.

Robinson "attempted to avoid Mr. Henderson . . . refus[ing] to answer his cell phone calls and his pages." Id. ¶ 20. "She asked her co-workers not to inform Mr. Henderson where she was

3

if he inquired." Id. Robinson also "asked a co-worker not to leave her alone" when she was at work. Id. ¶ 22. Robinson "acted in a manner to dissuade Mr. Henderson from making any sexual advances toward her." Id. ¶ 21.

Despite this series of events, Robinson "did not file a complaint of discrimination with Ergo Solutions." Id. ¶ 24. Robinson "believed it was useless to file a complaint . . . and that it would not be properly or seriously handled" by Ergo. Id. She "felt that it would only hurt her employment," and that the "owners would never find themselves at fault for their conduct and they would never punish one of their own." Id. Robinson's understanding was that "many other female employees at Ergo Solutions were victims of the same type of abuse, intimidation and humiliation at the hands of various owners." Id. ¶ 25. This understanding was purportedly informed by the fact that, during a previous investigation of sexual harassment allegations against another one of Ergo's owners, Robinson had been "asked to lie to the investigator by several owners." Id. ¶ 18. Specifically, Robinson was instructed to "win an academy award" with her false testimony during the investigation. Id.

On the issue of damages, Robinson alleged in her complaint that she has "suffered severe anxiety, stress, pain and humiliation as a result of Mr. Henderson's advances, text messages, calls and visits." Id. ¶ 26. She "has informed her doctor about Mr. Henderson's advances and has received treatment for stress [and] anxiety." And Robinson's "doctor has placed her under various medication regimes." Id. At the damages hearing, Robinson's testimony was generally consistent with the allegations of her complaint. See generally Feb. 19, 2014 Damages Hr'g Tr. ("Tr."). Her testimony included some description of how Henderson's conduct affected her mental well-being. Dr. Frances Cress Welsing also testified that, in her opinion, Robinson

4

suffered from post-traumatic stress disorder, due to the harassment she suffered while working for Ergo. Id. at 23. Robinson presented no evidence of out-of-pocket pecuniary damages.

### B. Procedural Background

Robinson filed this action on January 26, 2012, naming Ergo as the only defendant. After some difficulty serving process on Ergo's registered agent—who also happened to be Jason Henderson, the primary alleged wrongdoer in this case—Robinson ultimately served a copy of the summons and complaint on the Corporations Division of the District of Columbia Department of Consumer and Regulatory Affairs, which then forwarded the serving documents to the defendant, pursuant to D.C. Code § 29-104.12(d).

Service of process was completed on September 24, 2012, see Aff. for Default [ECF No. 5], and Ergo did not answer or otherwise respond to the complaint. Eventually, Robinson filed an affidavit for default, and the Clerk of the Court entered a default against Ergo on April 12, 2013. See Clerk's Entry of Default [ECF No. 7]. On May 24, 2013, Robinson filed a motion for default judgment. See Pl.'s Mot. for Default J. ("Pl.'s Mot.") [ECF No. 8]. Robinson requested $200,000 in compensatory damages and $200,000 in punitive damages, citing "emotional pain, suffering, inconvenience and mental anguish, loss of enjoyment of life, . . . other nonpecuniary losses," and "future pecuniary losses." Id. at 2. Robinson did not support this request with any admissible evidence—just a declaration from counsel restating those same high-level categories of claimed damages. Because the default only established Ergo's liability, and not the amount of damages, the Court entered a Minute Order on November 25, 2013, scheduling a hearing on the issue of damages and inviting Ergo to participate. See Nov. 25, 2013 Minute Order (citing United States v. Bentley, 756 F. Supp. 2d 1, 3 (D.D.C. 2010) ("Although the default establishes a

5

defendant's liability, the court is required to make an independent determination of the sum to be awarded unless the amount of damages is certain.")).

After delaying the hearing in order to resolve a series of procedural motions from Ergo (primarily regarding alleged defects in service of process),[1] the Court held the hearing on damages on February 19, 2014. Robinson presented two witnesses: herself, and Dr. Frances Cress Welsing, an expert in psychiatry. Ergo did not present any witnesses,[2] but did cross-examine Robinson's.

## LEGAL STANDARD

### A. Title VII Hostile Work Environment

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). The language of Title VII "is not limited to 'economic' or 'tangible' discrimination"; rather, "the phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to 'strike at the entire spectrum of disparate treatment of men and women' in employment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (quoting L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 n.13 (1978)).

---

[1] The details of those disputes are not relevant to the resolution of this motion for default judgment, and have been described at length in three written opinions, so they are not repeated again here. See Feb. 12, 2014 Mem. Op. & Order [ECF No. 31]; Feb. 3, 2014 Order [ECF No. 26]; Jan. 24, 2014 Mem. Op. [ECF No. 23]; Jan. 24, 2014 Order [ECF No. 22]; see also Tr. at 8-13 (describing procedural history, including service-of-process dispute and Ergo's unsuccessful (and repeated) motions to vacate default and to dismiss).

[2] Despite failing to file a witness list in advance of the hearing—ignoring repeated reminders and warnings from the Court that failure to do so would preclude it from putting on witnesses, see Tr. at 8-13—Ergo made an oral request at the damages hearing to put on "rebuttal" witnesses. Id. at 5. Rather than denying the request out of hand, the Court offered Ergo an opportunity to present its own witnesses at the close of Robinson's case, to testify regarding the issue of damages. Id.; see also id. at 52 (asking counsel for Ergo, "[d]o you have a desire to put on a rebuttal witness?"). At that time, Ergo represented to the Court that all of its proposed testimony "would go to the merits," id. at 52, rather than to the issue of damages. Because liability on the merits was established by Ergo's default, and the hearing was called solely to address the issue of damages, the Court denied Ergo's (untimely) request to put on witnesses to testify about the merits. Id.

A "hostile" work environment rises to the level of unlawful discrimination when the workplace "is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 65, 67). To make out a prima facie case for a Title VII gender-based, sexual harassment hostile-work-environment claim, the plaintiff-employee must show: "(1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment . . . ; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment . . . ; and (5) the existence of respondeat superior liability." Davis v. Coastal Int'l Sec., Inc., 275 F.3d 1119, 1122-23 (D.C. Cir. 2002) (citation and quotation marks omitted).

### B. Default Judgment

Federal Rule of Civil Procedure 55(a) provides that the clerk of the court must enter a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). After a default has been entered by the clerk of the court, a court may enter a default judgment pursuant to Rule 55(b). Fed. R. Civ. P. 55(b). "The determination of whether default judgment is appropriate is committed to the discretion of the trial court." Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (citing Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)). Upon entry of default by the clerk, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.,

239 F. Supp. 2d 26, 30 (D.D.C. 2002) (internal citation omitted). "Although the default establishes a defendant's liability, the court is required to make an independent determination of the sum to be awarded unless the amount of damages is certain." Id. (citing Adkins v. Teseo, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)). "[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment." Id. (citing United Artists Corp. v. Freeman, 605 F.2d 854, 857 (5th Cir. 1979)). If necessary, a court may "hold a hearing on damages before entering a judgment on an unliquidated claim even against a defendant who has been totally unresponsive." Jackson, 636 F.2d at 835.

## DISCUSSION

**I.    Liability**

Because a "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint," the Clerk's entry of default "establishes a defendant's liability." AARP v. Sycle, No. 13-0608, 2014 WL 185548, at *3 (D.D.C. Jan. 17, 2014). Here, Robinson's complaint alleges all the necessary elements of a Title VII gender-based hostile-work-environment claim. See Davis, 275 F.3d at 1122-23 ("(1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment . . . ; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment . . . ; and (5) the existence of respondeat superior liability.").[3] Hence, Ergo's failure

---

[3] Assuming all of the allegations in the complaint are true, the only element of the prima facie case that could have been seriously contested by Ergo is whether it is liable for the actions of Henderson (Robinson's direct supervisor, and Ergo's partial owner and Chief Information Officer) under a theory of respondeat superior. But because Robinson has alleged that she submitted to repeated, unwanted sexual advances, by her direct supervisor, who is also an owner and officer of Ergo, out of a fear that she would lose her job if she refused, Ergo is vicariously liable for Henderson's actions. See, e.g., Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee."); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) (same). And while a defendant-employer may typically raise an affirmative defense to

8

to answer or otherwise respond to Robinson's complaint establishes Ergo's liability under Title VII.[4]

## II. Damages

"Although the default establishes a defendant's liability, the court is required to make an independent determination of the sum to be awarded unless the amount of damages is certain." United States v. Bentley, 756 F. Supp. 2d 1, 3 (D.D.C. 2010). Robinson seeks $200,000 in compensatory damages and $200,000 in punitive damages. Pl.'s Mot. at 2. Because most of the claimed damages are related to pain, suffering, and mental anguish—that is, they are noneconomic in nature—the amount of damages is not "certain." For this reason, the Court held a hearing on the issue of damages. Based on the evidence submitted, the Court finds that Robinson is entitled to an award of $20,000 in compensatory damages, but that she is not entitled to punitive damages.

### A. Robinson Is Entitled To $20,000 In Compensatory Damages.

Robinson seeks $200,000 in compensatory damages. The evidence presented at the damages hearing, however, does not justify such an award—or even come close. Robinson presented no evidence whatsoever of any out-of-pocket economic damages stemming from the alleged harassment. No medication costs, no doctor's bills, no reduction in salary, no costs of

---

such a vicarious liability claim (if the employer exercised reasonable care to prevent such harassment), Ergo forfeited its right to raise affirmative defenses by its default. In any event, the complaint suggests that no such defense would have succeeded here. See, e.g., Compl. ¶¶ 18, 24, 25 (alleging that Ergo had a history of intentionally tampering with sexual harassment investigations regarding its owners, including an incident in which Robinson herself was "asked to lie to the investigator by several owners").

[4] At the damages hearing, counsel for Ergo argued, for the first time, that Robinson filed this lawsuit 91 days after receipt of her "right-to-sue letter" from the EEOC, in violation of the 90-day time limit in 42 U.S.C. § 2000e-5(f)(1). See Tr. at 6. Ergo did not actually attempt to introduce the right-to-sue letter into evidence, so the record contains no evidence whatsoever to support this argument. But in any event, "[t]he 90-day statutory period is not a jurisdictional prerequisite to filing suit, but rather operates as a statute of limitations, and is thus an affirmative defense." Ruiz v. Vilsack, 763 F. Supp. 2d 168, 170 (D.D.C. 2011). For that reason, it "is subject to waiver and equitable tolling." Smith-Haynie v. District of Columbia, 155 F.3d 575, 579 (D.C. Cir. 1998). So this defense was forfeited, along with every other non-jurisdictional affirmative defense, by Ergo's default. See, e.g., Feb. 12, 2014 Mem. Op. at 6-7 (holding that Ergo's argument that Robinson was an independent contractor rather than an employee was untimely and forfeited, because it went to the merits rather than subject-matter jurisdiction).

finding a new job—nothing.[5] Accordingly, the only damages she can recover are noneconomic—for pain, suffering, and mental anguish.

Robinson presented some evidence regarding noneconomic damages—but not much. In support of her claims, Robinson testified credibly that Henderson's treatment was "[h]umiliating" to her, and that she "didn't want to get up" in the morning as a result. Tr. at 35. During the period of Henderson's harassment, she "didn't want to leave the house," and "stopped answering [her] phone." Id. Robinson testified that she started "having panic attacks and headaches," and that she had to visit the emergency room to seek treatment. Id. at 36. Robinson also appeared visibly upset on the witness stand, and anyone present in the courtroom could see that she was having difficulty maintaining her composure while describing the events that took place while she worked at Ergo. See Tr. at 33. For these reasons, and because her testimony was consistent with the allegations of her complaint, the Court generally found Robinson's testimony to be credible.

Dr. Welsing also provided some modest corroboration of Robinson's testimony and allegations. Dr. Welsing testified that she diagnosed Robinson with post-traumatic stress disorder after two meetings in December 2013. Tr. at 23. She described Robinson's tearful demeanor at those two meetings, and noted that Robinson seemed "ashamed to talk about what had happened," and that doing so brought "tears to her eyes." Id. at 24. On the other hand, there is no testimony in the record from any doctor or psychiatrist (or anyone else) that Robinson discussed these issues with someone during (or near) the time that the harassment took place— her two meetings with Dr. Welsing took place <u>after</u> the Court scheduled a hearing on damages.

---

[5] The closest Robinson came to presenting evidence of economic damages was her testimony about $3,000 in startup costs that she incurred in starting a new massage-therapy business after leaving her job with Ergo. See Tr. at 38. But there is no evidence in the record to suggest that starting this business had any connection to the sexual harassment she suffered at Ergo, nor is there any evidence to suggest that leaving Ergo and starting her own business actually caused her any financial loss. Robinson did not, in short, present any evidence of damages from a discriminatory termination or constructive discharge type of claim.

The fact that Dr. Welsing was seemingly hired for the sole purpose of filing a plaintiff-friendly expert report in this case undercuts the weight that her testimony carries, as does the conclusory, too-good-to-be-true closing line in Dr. Welsing's expert report, claiming that "[m]aximal monetary compensation is [] essential in the healing process." Ex. B at Feb. 19, 2014 Damages Hr'g, Report of Dr. Frances Cress Welsing, M.D.

Other evidence in the record tends to undermine the claim that Robinson suffered extensive noneconomic damages. Most notably, when Robinson was asked whether she ever told "Mr. Henderson that [she] didn't want a relationship" or "to stop what he was doing," Robinson answered "No." Id. at 36. To be sure, Robinson testified that she felt that refusing Henderson's advances might have put her job at risk. Id. at 36-37. Nevertheless, the fact that she never told Henderson to stop the harassing behavior tends to undermine her claim that she suffered extensive pain, suffering, and mental anguish as a result of his actions. Even if filing a formal complaint with Ergo would have gone nowhere, as Robinson (credibly) claims, see Compl. ¶ 18, 24, 25; Tr. at 36-37, she still might at least have told Henderson that his advances were unwanted.

For these reasons, the Court finds that Robinson is entitled to $20,000 in compensatory, noneconomic damages. She has surely suffered some harm here, as evidenced by what appeared to be genuine anguish on the witness stand, and by the plainly inappropriate and highly offensive sexual harassment she seems to have suffered in the workplace. On the other hand, the actual evidence of damages in the record is quite thin,[6] so the Court could not justify awarding anything

---

[6] This may be due, at least in part, to the fact that only two witnesses testified on Robinson's behalf at the damages hearing, despite there being six proposed witnesses on Robinson's witness list. Feb. 12, 2014 Witness List [ECF No. 30]. Unfortunately for her, Robinson is the party who bears the risk of her own witnesses failing to attend the damages hearing. In addition, the affidavit Robinson entered into evidence (without objection from Ergo), simply repeated the allegations of the complaint in a conclusory fashion—any factual discussion was merely consistent with her testimony, rather than incrementally helpful to the Court. See Ex. C at Feb. 19, 2014 Damages H'rg.

close to the $200,000 in compensatory damages Robinson initially requested.[7] While awarding noneconomic damages for pain, suffering, and mental anguish is necessarily an arbitrary endeavor to some degree, in exercising its discretion, the Court finds that an award of $20,000 is appropriate here, based upon a consideration of the entire record, and all the facts and circumstances of Robinson's case.

### B. Robinson Is Not Entitled To Punitive Damages.

Title VII allows for an award of punitive damages "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Supreme Court has noted that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 535 (1999). In other words, the plaintiff must put forth some evidence regarding the mental state of the employer-defendant to recover punitive damages. See id. at 538. Robinson put on no evidence whatsoever regarding the mental state of the alleged wrongdoers in this case, and the complaint is similarly devoid of any such allegations. Indeed, Robinson concedes she never raised a complaint with Ergo. See Compl. ¶ 24. As a result, the record contains no "facts sufficient to support an inference that the requisite mental state can be imputed," to Ergo. See Kolstad, 527 U.S. at 546. Hence, Robinson is not entitled to punitive damages.[8]

---

[7] Even if Robinson had made a stronger evidentiary showing, Title VII's damages cap would likely have reduced her recovery. Employer-defendants with "more than 14 and fewer than 101 employees" face a maximum liability of $50,000 in noneconomic damages. 42 U.S.C. § 1981a(b)(3)(A). And the only evidence in the record regarding Ergo's size suggests that Ergo had between 14 and 101 employees during the relevant time period. See Tr. at 49-50 ("I think it was like 99. . . . About less than 100.").

[8] If Robinson had been entitled to punitive damages, the total damage award would have been capped at $50,000, see supra note 7. Robinson's motion for default judgment seems to assume that Title VII's damages cap applies separately to awards of compensatory and punitive damages. See Pl.'s Mot. at 2. It does not—the cap applies to the combined total of all damages awarded. See, e.g., Jefferson v. Milvets Sys. Tech., Inc., 986 F. Supp.

## CONCLUSION

For the foregoing reasons, Robinson's motion for default judgment will be granted, and judgment will be entered in favor of Robinson and against Ergo in the amount of $20,000. A separate order accompanies this memorandum opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: March 4, 2014

---

6, 11 n.6 (D.D.C. 1997) ("[T]he damages cap applies to the combined sum of compensatory and punitive damages."); accord Hogan v. Bangor & Aroostook R. Co., 61 F.3d 1034, 1037 (1st Cir. 1995).